State *v.* Johnson

# STATE OF CONNECTICUT *v*. MILES JOHNSON
## (SC 20878)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder, burglary in the first degree, conspiracy to commit burglary in the first degree, and tampering with physical evidence, the defendant appealed to this court. Shortly after the discovery of the decomposed body of the victim, with whom the defendant previously had an intimate relationship, the police conducted a series of three interviews with the defendant. Prior to the second interview, the police read the defendant his rights under *Miranda* v. *Arizona* (384 U.S. 436), and the defendant agreed to waive those rights. Thereafter, during that interview, the defendant made certain incriminating statements after which he told the police that he was "done talking . . . ." At that point, the interview ended, and the defendant was placed under arrest. The next morning, while the defendant was awaiting transport to court for his arraignment, he indicated to B, a detective, his desire to speak again. During this third interview, in response to the defendant's equivocal request for counsel, B advised the defendant of his *Miranda* rights, and the defendant again agreed to a waiver of those rights. During this third interview, the defendant admitted to killing the victim. The trial court denied the defendant's pretrial motion to suppress his statements from the third interview, in which he claimed that B had not clarified his equivocal invocation of his right to counsel, in violation of the state constitution, as articulated in *State* v. *Purcell* (331 Conn. 318). On appeal, the defendant claimed, inter alia, that the trial court had improperly denied his motion to suppress. *Held*:

The defendant could not prevail on his unpreserved claim that the trial court had improperly admitted into evidence the video recording of his second interview with the police on the ground that he did not validly waive his *Miranda* rights prior to making incriminating statements during that interview, as defense counsel affirmatively waived the defendant's *Miranda*-based claim at trial.

Defense counsel waived any *Miranda*-based claims arising from the second interview, insofar as he challenged only the admission of statements made during the third interview in the motion to suppress, and it was apparent that defense counsel made an affirmative decision not to challenge at trial the statements made during the second interview on the ground that the admission of those statements violated the defendant's *Miranda* rights.

There was no merit to the defendant's claim that the trial court had improperly admitted into evidence the video recording of the third interview with B on the ground that B had failed to clarify the defendant's equivocal request for

354 Conn. 96      FEBRUARY, 2026      97

State *v.* Johnson

counsel, in violation of his rights under the state constitution, as articulated in *Purcell*.

Given that the defendant initiated the third interview after previously invoking his *Miranda* rights just hours beforehand and that the defendant then made an equivocal invocation of his right to counsel, B's provision of *Miranda* warnings at that point was a reasonable and sufficient response, as B sought to ensure that the defendant understood all of his rights, including the right to counsel, before any interrogation commenced.

Moreover, the defendant's express waiver of his *Miranda* rights, following B's advisement of those rights, for a second time, within less than twelve hours between the second and third interviews, manifested the defendant's clear and unequivocal desire to proceed with the third interview without counsel, and, under the circumstances, that readvisement sufficiently clarified the defendant's equivocal request for counsel.

Furthermore, there was no merit to the defendant's claim that certain unprompted comments that B made after the defendant's waiver of his *Miranda* rights during the third interview constituted an impermissible attempt to persuade the defendant to waive his rights in order to continue with that interview, as B merely attempted to explain that, as a practical matter, it was improbable that the defendant could obtain an attorney to be present for questioning at the police station prior to his arraignment, which was scheduled for that same morning.

The trial court properly denied the defendant's motion to suppress his cell phone records and all of the evidence derived therefrom, including location data, as the warrant authorizing the search and seizure of the defendant's cell phone satisfied the constitutional requirements of probable cause and particularity.

The warrant was supported by probable cause, as the facts contained in the affidavit in support of that warrant, together with the reasonable inferences that could be drawn therefrom, established a fair probability that the defendant had been involved in the victim's murder.

Moreover, the warrant satisfied the particularity requirement insofar as it sought a list of specific records, over a relevant time period, that was sufficiently limited and connected to the factual circumstances surrounding the victim's murder.

Contrary to the defendant's claim, the warrant did not authorize an impermissible general search of all of his cell phone records in view of the warrant's use of the phrase "including, but not limited to," as the warrant authorized a search of only the defendant's cell phone records that were in the possession of his cell phone carrier and that were created within a limited time period.

(*Three justices dissenting in part in one opinion*)

Argued September 24, 2025—officially released February 3, 2026

State *v.* Johnson

*Procedural History*

Substitute information charging the defendant with the crimes of murder, burglary in the first degree, conspiracy to commit burglary in the first degree, tampering with physical evidence, and conspiracy to commit tampering with physical evidence, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Preleski, J.*; verdict of guilty; thereafter, the court, *Preleski, J.*, vacated the conviction of conspiracy to commit tampering with physical evidence and rendered judgment of conviction of murder, burglary in the first degree, conspiracy to commit burglary in the first degree, and tampering with physical evidence, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Meryl R. Gersz*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Don Therkildsen*, supervisory assistant state's attorney, and *Alexandra Arroyo*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. Following a trial, a jury found the defendant, Miles Johnson, guilty of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, burglary in the first degree in violation of General Statutes § 53a-101 (a) (3) and § 53a-8, conspiracy to commit burglary in the first degree in violation of § 53a-101 (a) (3) and General Statutes § 53a-48, tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1) and § 53a-8, and conspiracy to commit tampering with physical evidence in violation of §§ 53a-155 (a) (1) and 53a-48. The trial court rendered judgment of conviction and imposed a total effective sentence of fifty-five years of incarceration.[1]

---

[1] At sentencing, the trial court vacated the defendant's conviction for conspiracy to commit tampering with physical evidence under *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013).

State *v.* Johnson

The defendant appeals from the judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3). On appeal, the defendant claims that the trial court improperly (1) admitted into evidence the video recording of his September 23, 2020 police interview (September 23 interview) because the waiver of his *Miranda*[2] rights was invalid, (2) denied his motion to suppress all evidence, including the video recording, of the statements he made during his September 24, 2020 police interview (September 24 interview) because the police had failed to clarify his equivocal request for counsel, in violation of his state constitutional rights under *State* v. *Purcell*, 331 Conn. 318, 203 A.3d 542 (2019), and (3) denied his motion to suppress his cell phone records and all evidence derived therefrom because the search warrant to obtain that evidence was not supported by probable cause and lacked particularity.[3] We reject each of the defendant's claims and therefore affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, Lerato Rahaba Rachel Sebetlela, had an on-and-off sexual relationship that began sometime in 2018. In early 2020, both the defendant's girlfriend, Casandra Nazario, and the victim's boyfriend, Galani Modongo, learned about an ongoing affair between the defendant and the victim.

---

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The defendant raises two additional claims. First, the defendant claims that the trial court erred by failing to disclose potential impeachment or exculpatory materials to the defendant in accordance with *Giglio* v. *United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and asks that we review certain sealed personnel records to determine if there is any information that constitutes exculpatory and/ or impeachment evidence that would affect his constitutional rights to confrontation, to due process, and to present a defense. Second, the defendant claims that the trial court deprived him of his constitutional right to due process because its jury instructions on the burglary charge improperly invaded the province of the jury. We have reviewed both claims, as well as the sealed documents, and we discern no error on the part of the trial court.

State *v.* Johnson

On the morning of July 10, 2020, Modongo sent a message using Facebook Messenger to Nazario to inform her that he had evidence that the defendant was still involved with the victim. After Modongo provided her with the evidence, Nazario confronted the defendant about the affair, and, although he initially denied it, the defendant eventually admitted that he and the victim had been having sex. At that point, the defendant told Nazario that the victim "need[ed] to die." Nazario and the defendant prepared a plan to kill the victim, which included buying supplies to kill her and to clean up the crime scene afterward.

Late at night, on July 10, 2020, the defendant and Nazario drove to the victim's apartment to carry out their plan. While Nazario waited downstairs, the defendant went upstairs into the victim's apartment and stabbed the victim until she was close to death. Ten to fifteen minutes later, Nazario entered the apartment and further stabbed the victim. Once the victim was dead, the defendant and Nazario proceeded to tape the victim's arms and legs together, to wrap her body in a blanket, and to cover her body in garbage bags. They then cleaned up the blood from the floor and the kitchen cabinets. After that, they staged the apartment to make it appear as though the victim had left in a hurry.

The defendant and Nazario put the victim's body into the trunk of the defendant's vehicle and drove to Black Rock State Park in Watertown. When they arrived, the gate to the park was closed. This prompted the defendant to drive a little farther, before pulling over on the side of Route 6. The defendant and Nazario then took the victim's body out of the trunk and pushed it under the guardrail so that it rolled down the hill into a wooded area. The pair then returned to the defendant's house, where they burned evidence of the killing in a firepit.

Two months later, on September 12, 2020, the state police recovered the victim's dead body wrapped in a quilt, duct tape, and black garbage bags. Shortly thereafter, Steven Brownell, a detective with the Waterbury

354 Conn. 96 FEBRUARY, 2026 101

State *v.* Johnson

Police Department, obtained the victim's cell phone records, which revealed that the last communication on the her cell phone was a phone call originating from the defendant's cell phone. Brownell interviewed the defendant on three separate occasions: September 18, 23 and 24, 2020. After the defendant made inculpatory statements during the September 23 interview, Brownell arrested him for the murder of the victim. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's challenge to the September 23 interview. The defendant claims that the trial court improperly admitted into evidence the video recording of his September 23 interview, in violation of his rights under the fifth and fourteenth amendments to the United States constitution. The defendant argues that the video recording was improperly admitted into evidence because he was in police custody and did not validly waive his rights prior to making incriminating statements in response to police interrogation. Specifically, he contends that his waiver was neither knowing and intelligent nor voluntary, as required under *Miranda* v. *Arizona*, 384 U.S. 436, 444, 474–76, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant acknowledges that he did not object to the admission of this video recording at trial and thus concedes that this claim is unpreserved. He therefore seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). The state argues, inter alia, that the defendant cannot satisfy the third prong of *Golding*, the existence of a constitutional violation, because defense counsel affirmatively waived the defendant's *Miranda* claim at trial. We agree with the state's argument that the defendant has waived his constitutional claim and, therefore, conclude that his claim fails under *Golding*'s third prong.

The following additional facts are relevant to our analysis. After being contacted by the police, the defendant

State *v.* Johnson

agreed to go to the police station on September 18, 2020, to be interviewed (September 18 interview). During the September 18 interview, the defendant provided a written statement, in which he acknowledged, among other things, that he had a sexual relationship with the victim, called the victim around midnight on July 11, 2020, and spoke to Modongo over the phone several days later. After the September 18 interview, the police obtained a search warrant for the defendant's cell phone records. The records they received included location data that showed that the defendant was near the victim's apartment and Black Rock State Park during the night of July 10, 2020, and into the early morning hours of July 11, 2020.

On September 23, 2020, when they received the defendant's cell phone records, Brownell and other members of the Waterbury Police Department went to the defendant's residence and asked him if he would come back to the station house for an interview. After the defendant agreed, the officers brought him to an interview room at the station house, and the September 23 interview commenced at about 9:42 p.m. At the outset, Brownell read the defendant his *Miranda* rights, and the defendant executed a written waiver of those rights. During the course of the September 23 interview, the defendant made incriminating statements, including an admission that he drove with Nazario to a wooded area that may have been Black Rock State Park. After making those admissions, the defendant said he was "done talking," and Brownell ended the September 23 interview. Brownell then arrested the defendant and placed him in custody. The September 23 interview concluded at approximately 2:03 a.m., on September 24, 2020.

Later in the morning on September 24, 2020, at approximately 8 a.m., when Brownell arrived at the police station for work, the defendant was awaiting transport to court. When he saw Brownell, the defendant indicated a desire to speak to him again. As a result, Brownell

354 Conn. 96 FEBRUARY, 2026 103

State *v.* Johnson

interviewed him for a third time. During the September 24 interview, the defendant admitted to killing the victim.

Prior to trial, the defendant moved to suppress only the September 24 interview statements on the ground that the police had not clarified his equivocal invocation of the *Miranda* right to counsel, as required by this court's decision in *State* v. *Purcell*, supra, 331 Conn. 362. At the hearing on the motion to suppress, defense counsel acknowledged that there were three interviews and that the only one at issue was the September 24 interview.

During his testimony at the suppression hearing, Brownell described the process of the investigation and the defendant's arrest. As part of this description, Brownell testified about the September 23 interview as background to the September 24 interview that was the subject of the defendant's motion to suppress. When the prosecutor later offered into evidence the advisement card that the defendant had signed on September 23, 2020, acknowledging that he was waiving his *Miranda* rights, defense counsel objected that it was "not relevant to the issue that our motion raises," which he previously explained was "the requirements of the police when a suspect makes an equivocal request for an attorney." The trial court overruled the objection.

Shortly thereafter, the prosecutor sought to admit portions of the September 23 interview video recording showing that the defendant had received *Miranda* warnings and that he had also invoked his rights at the end of the interview. Defense counsel again objected on the ground of relevance, claiming, as he argued earlier, that those portions of the September 23 interview had no relevance to the legal issue that the court had to decide, namely, whether, during the September 24 interview, the police properly addressed the defendant's equivocal request for counsel. The trial court overruled that objection. After the evidentiary portion of the hearing had concluded, the arguments of counsel focused solely on the suppression of the statements from the September

State *v.* Johnson

24 interview. The trial court denied the defendant's motion to suppress in a memorandum of decision that also described the September 23 interview and in which the court concluded that the defendant's *Miranda* waiver at that interview was knowing and voluntary.

At trial, the prosecutor introduced the video recordings of the September 23 and 24 interviews into evidence. The prosecutor offered the video recording of the September 23 interview into evidence as a state exhibit during Brownell's testimony. At that time, defense counsel objected to "the showing of the statements made by . . . Brownell." In making this objection, defense counsel stated: "I understand [that] *the statements from* [*the defendant*] *would be admissible*, but my objection [is] to statements made by [Brownell] as, you know, not being relevant, prejudicial." (Emphasis added.) Following a sidebar, the trial court overruled defense counsel's objection but instructed the jury that only the defendant's statements were to be considered as evidence. The video recording of the September 23 interview was then played for the jury, but a brief recess took place before the video ended. During this recess, the trial court confirmed with the parties that "the objection was overruled with respect to the admissibility" and that neither the prosecutor nor defense counsel had "any comment with respect to the instruction that the court gave . . . ." Defense counsel stated: "No. I was fine with that instruction." The remainder of the video recording of the September 23 interview was then played for the jury, followed by the video recording of the September 24 interview, with the same instruction given to the jury.

It is undisputed that the defense did not raise a *Miranda*-based challenge to the admission of the video recording of the September 23 interview prior to or at trial, and, therefore, the defendant seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the

State *v.* Johnson

following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if subject to harmless error analysis, the state has failed to demonstrate [the] harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two prongs govern whether we may review the claim, [whereas] the second two control whether the defendant may prevail on his claim because there was constitutional error that requires a new trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Johnson*, 345 Conn. 174, 189, 283 A.3d 477 (2022); see *State* v. *Golding*, supra, 239–40; see also *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*). "In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 240; see, e.g., *State* v. *Santana*, 313 Conn. 461, 469–70, 97 A.3d 963 (2014).

"A waived claim, as opposed to an unpreserved claim, does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court. . . .

"It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution. . . . The mechanism by which a right may be waived, however, varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver

State *v.* Johnson

may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Citations omitted; internal quotation marks omitted.) *State* v. *Hinton*, 352 Conn. 183, 202–203, 336 A.3d 62 (2025); see, e.g., *State* v. *Iverson*, 352 Conn. 422, 436, 336 A.3d 1212 (2025); *State* v. *Culbreath*, 340 Conn. 167, 179, 263 A.3d 350 (2021); *State* v. *Holness*, 289 Conn. 535, 543–44, 958 A.2d 754 (2008). "We employ plenary review to determine whether defense counsel had waived this claim before the trial court." *State* v. *Hinton*, supra, 204.

"The decision to admit or exclude evidence on constitutional, statutory, or evidentiary grounds is the type of tactical trial decision that appropriately may be waived by counsel acting alone . . . ."[4] (Internal quotation marks omitted.) *State* v. *Culbreath*, supra, 340 Conn. 180. For example, "[t]his state's appellate courts have held that defense counsel's indication that he or she had no objection to the admission of an exhibit at trial constituted a waiver of the defendant's confrontation rights and failed to satisfy *Golding*'s third prong." *State* v. *Hinton*, supra, 352 Conn. 203. *Miranda* related rights are among the constitutional rights that may be waived by counsel at trial. See, e.g., *State* v. *Culbreath*, supra, 182; *State* v. *Boyd*, 295 Conn. 707, 750 and n.26, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011).

The defendant contends that the lack of a timely motion to suppress the September 23 interview was a failure of preservation, but not a waiver, when viewed in context.

_____

[4] "To be effective . . . defense counsel's waiver must be knowing and intelligent. . . . This requirement ordinarily is met easily because it is presumed that, in our adversary system, counsel was familiar with the relevant constitutional principles and had acted competently in determining that . . . the defendant's [constitutional] rights were protected. . . . Consequently, to demonstrate knowing and intelligent waiver, the state ordinarily is not required to establish that defense counsel was aware of a possible constitutional claim in the factual scenario presented . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Culbreath*, supra, 340 Conn. 181.

354 Conn. 96 FEBRUARY, 2026 107

State *v.* Johnson

The defendant further argues that "defense counsel's statement [at trial] that the [defendant's September 23 interview statements were] *admissible* is taken out of context" by the state, as "defense counsel was simply explaining that his objection concerned [Brownell's] statements," rendering it "not a waiver." (Emphasis added.) We agree with the defendant that we must consider the full context of defense counsel's statements in assessing whether a waiver of the *Miranda* claim occurred. See, e.g., *State* v. *Iverson*, supra, 352 Conn. 436–37.

After reviewing the entire context of counsel's statements, we conclude that defense counsel's actions waived *Miranda* claims arising from the September 23 interview. Specifically, defense counsel challenged only the September 24 interview in the motion to suppress. Defense counsel, moreover, presumably was aware of potential *Miranda* issues relating to the September 23 interview, which figured prominently in the litigation of the motion to suppress the September 24 interview. In fact, defense counsel repeatedly objected to evidence of the defendant's purported *Miranda* waiver being admitted at the suppression hearing on the ground that it was not relevant to the motion to suppress. In doing so, defense counsel "attempted to narrow" the scope of the suppression hearing to evidence of the September 24 interview and actively discouraged the consideration of any potential *Miranda* issues relating to the September 23 interview.[5] Ultimately, the trial court's memorandum of decision on the motion to suppress expressly discussed the September 23 interview and found that

_____

[5] During the suppression hearing, defense counsel explained that he "attempted to narrow [the] hearing with relevance objections regarding a lot that the state had introduced outside of . . . [t]he short part [of the September 24 interview] where there was an equivocal invocation made [by the defendant], and [Brownell] responded." Defense counsel's strategy was based on his belief that only "that part of the conversation . . . really mattered" insofar as it was the only part that was relevant to his claim that the police failed to properly address the defendant's equivocal request for counsel. Defense counsel asserted that "the knowingness and the voluntariness of a *Miranda* waiver [were] not in that claim."

State *v.* Johnson

"the defendant had a full understanding of his rights" during that interview and that he waived them knowingly and voluntarily. The defendant did not file a motion or otherwise challenge those findings.

Defense counsel never objected to the admission at trial of the statements that the defendant made during the September 23 interview. Indeed, at trial, defense counsel conceded that the defendant's statements during the September 23 interview were "admissible," distinguishing them from Brownell's comments during that interview, to which he objected. Given this full context, and the presumption that "counsel was familiar with the relevant constitutional principles and had acted competently in determining that . . . the defendant's [constitutional] rights were protected"; (internal quotation marks omitted) *State* v. *Culbreath*, supra, 340 Conn. 181; it is apparent that defense counsel made an affirmative decision not to challenge the September 23 statements at trial on *Miranda* grounds. See, e.g., *State* v. *Iverson*, supra, 352 Conn. 433–37 (concluding that defense counsel's anticipation of medical examiner's testimony in connection with his objection to graphic crime scene photographs indicated that his failure to raise confrontation clause objection to medical examiner testimony and autopsy report was "strategic" in nature, thus waiving confrontation claim under third prong of *Golding*). We therefore conclude that the defendant has waived any *Miranda* claim arising from the September 23 interview, rendering relief unavailable under the third prong of *Golding*.

II

Next, the defendant claims that the trial court improperly admitted into evidence the video recording of the September 24 interview. Specifically, he asserts that the trial court should have granted his motion to suppress all testimony and evidence related to the September 24

354 Conn. 96 FEBRUARY, 2026 109

State *v.* Johnson

interview because Brownell failed to stop the interview and to clarify the defendant's equivocal request for counsel before interrogating him, as required under article first, §8, of the Connecticut constitution and this court's decision in *State* v. *Purcell*, supra, 331 Conn. 362. We are not persuaded.

The following additional facts and procedural history are relevant to our analysis. After the September 23 interview ended, the defendant was arrested and taken into custody in the early morning hours of September 24, 2020. The defendant's arraignment was scheduled for later that morning. Accordingly, when Brownell returned to work around 8 a.m., the defendant was in the holding area of the detective bureau at the Waterbury Police Department, awaiting transport to court for his arraignment.

Upon seeing Brownell enter the detective bureau, the defendant motioned for Brownell to come over and to speak with him. When Brownell opened the door to the holding area, the defendant asked, "what's going on?" Brownell explained that the defendant would soon be transported to court. The defendant then expressed his desire to speak further with Brownell. In response to this request, Brownell brought the defendant to a nearby interview room.

Almost immediately upon entering the interview room, the defendant asked: "I can't have a lawyer present, right?" Apparently unable to hear the defendant's question, Brownell responded, "[h]uh?" The defendant then repeated, "[c]an I have a lawyer present, or no?" Brownell responded, "[i]f you wanted a lawyer right now, it's going to happen when you go over to court, is what it boils down to, okay?" Brownell then said, "[w]hen I came in, I saw you in the holding room there, and you said that you wanted to talk about something . . . ." The defendant responded, "[n]o, I was just asking." Brownell continued: "[T]o be crystal clear, when we ended last night, you said

State *v.* Johnson

that you were done talking, okay? . . . And, this morning, you said that there was something that you wanted to talk about . . . is that fair?" The defendant responded, "[t]hat's fair, yeah."

Then, before beginning the interrogation, Brownell advised the defendant of his *Miranda* rights. Specifically, Brownell provided the defendant with an "advisement of rights card," and he clearly read the rights aloud: "You have the right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court. You have the right to consult an attorney before you are questioned, and you may have him or her with you during questioning. If you cannot afford a lawyer, one will be appointed to you, if you wish, before any questioning. If you wish to answer questions, you can stop answering at any time. You may stop answering at any time if you wish to talk to an attorney, [and] you may have him or her with you during any questioning." The defendant read his rights written on the advisement card and circled "[y]es" in response to the questions of "[d]o you understand these rights" and "[d]o you wish to give up these rights and answer my questions?" The defendant signed and dated the advisement card, and initialed beside every applicable right and question.

After the defendant signed and initialed the waiver of rights and prior to asking him any questions, Brownell asked, "[d]o you understand those? I know you mentioned having an attorney when we first got here. Okay. That's something that would happen over at court. So, if you are not comfortable talking to me right now without the attorney, that's your choice. I understand that. But . . . you said you wanted to talk about something, okay?" Over the course of the nearly fifty minute interview that followed, the defendant admitted to killing the victim, disposing of her body, and destroying the evidence.

The defendant filed a motion to suppress the video evidence, in addition to other potential evidence, of the

State *v.* Johnson

statements he made during the September 24 interview on the ground that Brownell had failed to clarify the defendant's equivocal request for counsel, as required by *State* v. *Purcell*, supra, 331 Conn. 362. The prosecutor conceded that the defendant was in custody and that the defendant's request was equivocal. After a hearing, the trial court denied the defendant's motion, concluding that Brownell had satisfied *Purcell* "because, after [the defendant's] equivocal invocation [of his right to counsel] . . . Brownell conducted no further questioning of the defendant [and] advised the defendant of his rights in a clear, unambiguous fashion, and the defendant expressed, in writing, his desire to waive his rights and [to] continue to speak to . . . Brownell."

On appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence regarding the statements he made during the September 24 interview. Specifically, the defendant asserts that Brownell's actions did not comply with *Purcell* because Brownell failed to ask clarifying questions once the defendant made his equivocal request for counsel and merely readministered the *Miranda* warnings, which was not an acceptable response under the circumstances. We disagree.

We begin with the applicable standard of review. "[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are

112        FEBRUARY, 2026              354 Conn. 96

State *v.* Johnson

legally and logically correct and whether they find support in the facts [found by the trial court] . . . ." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 394, 40 A.3d 290 (2012).

In *State* v. *Purcell*, supra, 331 Conn. 361–62, "we determined that the federal constitutional standard set forth in *Davis* v. *United States*, [512 U.S. 452, 459–60, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)], requiring a suspect's invocation of the right to counsel to be clear and unequivocal, does not adequately safeguard *Miranda*'s right to the advice of counsel during a custodial interrogation. . . . We therefore adopted a more protective standard under article first, §8, of the Connecticut constitution, which requires questioning to cease after the advisement of *Miranda* rights if a suspect makes an equivocal statement that arguably can be construed as a request for counsel . . . . *Purcell* states that questioning may not resume once a defendant expresses such a request, except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel. . . . Alternatively, [i]nterrogators confronted with such a situation . . . may inform the defendant that they understand his statement(s) to mean that he does not wish to speak with them without counsel present and that they will terminate the interrogation. . . . In either scenario, questioning may not resume until the defendant thereafter clearly and unequivocally expresses a desire to continue without counsel present . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Culbreath*, supra, 340 Conn. 185–86.

Our decision in *State* v. *Culbreath*, supra, 340 Conn. 167, provides helpful guidance in deciding the claim before us. In that case, we addressed two equivocal requests for counsel;[6] the first request was properly addressed by the police and the second was not. See id., 186–91. With respect to the first request, before the

---

[6] This court assumed, without deciding, that the first request for counsel was an equivocal request for counsel. See, e.g., *State* v. *Culbreath*, supra, 340 Conn. 187.

354 Conn. 96 FEBRUARY, 2026 113

State *v.* Johnson

start of his interview with the police, the defendant asked about the waiver form and what it meant to waive the right to have an attorney present. See id., 186–87. A detective then explained the *Miranda* rights to the defendant, and the defendant signed the waiver form. Id., 187. We concluded that the detective "complied with the dictates of *Purcell* by seeking clarification from the defendant before beginning the interview . . . [and that] [t]he defendant's express waiver of his *Miranda* rights following [the detective's] explanation manifested the defendant's clear and unequivocal desire to proceed with the interview without the presence of counsel." Id.

Similar to the circumstances in *Culbreath*, during the September 24 interview, after the defendant in the present case made his equivocal request for counsel and before beginning the interrogation, Brownell appropriately sought clarification by rereading the defendant his *Miranda* rights. Importantly, just hours before, during the September 23 interview, Brownell had advised the defendant of his *Miranda* rights, and that interview ended when the defendant invoked his rights.[7] Given that the defendant initiated the September 24 interview after previously invoking his *Miranda* rights and then immediately made an equivocal invocation of his right to counsel, Brownell's provision of *Miranda* warnings was a reasonable and sufficient response. This is because, by providing the defendant with *Miranda* warnings, Brownell sought to ensure that the defendant understood all of his rights, including the right to counsel, before any interrogation commenced. Of course, the best response to the defendant's question would have been to simply answer, "yes, you may have counsel present during questioning." That, however, is precisely what

---

[7] The September 23 interview ended with the following colloquy:

"[The Defendant]: Since I'm being arrested, sir, I doubt if an attorney makes any sense, but—

"[Brownell]: Okay. You are all done talking about it?

"[The Defendant]: I'm done talking, sir. Because I'm being arrested, sir."

State *v.* Johnson

Brownell did convey to the defendant by readministering the *Miranda* warnings in their totality.

By providing the *Miranda* warnings, Brownell specifically clarified the defendant's right to counsel. Brownell advised the defendant that he had "the right to consult [with] an attorney before [being] questioned," to "have [an attorney] with [him] during questioning," and to "stop answering at any time," including for the purpose of talking to an attorney. The defendant acknowledged that he understood the right to counsel by writing his initials next to that right on the advisement card. The defendant then expressly waived his *Miranda* rights in writing. Therefore, we conclude that the defendant's express waiver of his *Miranda* rights, following Brownell's advisement of those rights, for a second time, within less than twelve hours, manifested the defendant's clear and unequivocal desire to proceed with the interview without counsel. See *State* v. *Culbreath*, supra, 340 Conn. 187–88. Under the circumstances of the present case, this readvisement sufficiently clarified the defendant's equivocal request for counsel.[8]

After he waived his *Miranda* rights, the defendant did not make another equivocal request for counsel; nor did he indicate in any fashion that he did not understand his right to have counsel present during questioning. However, without being prompted, Brownell made another attempt to ensure that the defendant was comfortable going forward without an attorney given that the defendant had mentioned counsel before the readvisement and waiver. Brownell stated: "Do you understand those? I know you mentioned having an attorney when we first got here. Okay. That's something that would happen

---

[8] Here, given the fact that the defendant had invoked his right to end police questioning just a few hours before the September 24 interview, and the defendant reinitiated the interview while simultaneously making an equivocal request for counsel, the readvisement of *Miranda* rights, which directly addressed his equivocal request, was appropriate. Although a rereading of the *Miranda* warnings will, in most contexts, constitute an appropriate clarification under *Purcell*, there certainly may be other circumstances in which it is not.

State *v.* Johnson

over at court. So, if you are not comfortable talking to me right now without the attorney, that's your choice. I understand that. But . . . you said you wanted to talk about something, okay?"

The defendant asserts that Brownell's comments both before and after the defendant's waiver did not constitute proper clarifications under *Purcell*. In particular, the defendant contends that Brownell's additional commentary constituted an impermissible attempt to persuade the defendant to waive his rights in order to continue with the September 24 interview by suggesting that the defendant could get an attorney only once he went to court and highlighting that it was the defendant who wished to talk. Because Brownell correctly informed the defendant about his right to have counsel present during questioning, and the defendant never indicated that he was unclear about his waiver of that right, we conclude that Brownell's comments did not impact the defendant's clear and unequivocal desire to proceed without a lawyer.

We recognize that Brownell's statements were not perfect explanations of the defendant's right to counsel. Nevertheless, after evaluating Brownell's comments in context, we agree with the trial court that Brownell's responses merely attempted to explain "the practicalities governing the defendant's circumstances and [were] not 'designed to influence the [defendant] not to invoke his rights.' *United States* v. *March*, 999 F.2d 456, 462 (10th Cir.) [cert. denied, 510 U.S. 983, 114 S. Ct. 483, 126 L. Ed. 2d 434 (1993)]."

Those practicalities were that the defendant had initiated the September 24 interview by indicating a desire to speak to Brownell while he was waiting to be transported to court for his arraignment, where an attorney indeed would be appointed. Given this timing, we understand Brownell's statements to be aimed at explaining the current circumstances to the defendant. Although Brownell failed to address the technical, albeit practically improbable, possibility that the defendant could obtain an attorney to be present for questioning at the

State *v.* Johnson

police station prior to his arraignment, the defendant had previously been informed of his right to have an attorney present for any questioning via Brownell's *Miranda* warnings, and he expressly waived that right. Brownell's additional commentary did not undermine the effect of the defendant's waiver of his right to have an attorney present for the September 24 interview. See, e.g., *Duckworth* v. *Eagan*, 492 U.S. 195, 204, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989) ("*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. . . . If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." (Citation omitted; footnote omitted.)).

Furthermore, we are not persuaded by the defendant's argument that Brownell's additional commentary was an impermissible "[attempt] to convince the defendant that it was against his [interest] not to continue the interview." *State* v. *Purcell*, supra, 331 Conn. 362. There is a stark contrast between Brownell's statements and comments that are impermissibly aimed at convincing that it is against one's interest not to continue an interview with the police. For example, in *Purcell*, one of the detectives said to the defendant: "[A]fter today, you're never gonna be able to, to give me or any other cop your story. You're gonna let, a judge is gonna look at ya and say, some serious charges against you. You could go to jail for the rest of your life." (Internal quotation marks omitted.) Id., 327. Similarly, in *Culbreath*, a detective told the defendant that, "if he had an attorney present, the attorney 'probably won't let me talk to you,' and 'the cards [will] fall the way they will' without the defendant telling the 'story' of 'the why or the who or the what reason.'" *State* v. *Culbreath*, supra, 340 Conn. 189. These types of comments are aimed at convincing

State *v.* Johnson

a defendant that it is against his or her interest not to continue a police interview.

Given the particular circumstances of this case, in which the defendant was about to be transported to court for an arraignment but sought to reinitiate a police interview that he had, just hours before, terminated, Brownell's references to the appointment of an attorney in court and the defendant's desire to talk do not evince any intent to convince the defendant to waive his right to counsel. Rather, Brownell's statements were even more neutral in substance and tone than the detective's permissible response to the first allegedly equivocal request in *Culbreath*. Cf. id., 173, 186–88. In *Culbreath*, before the start of his interview with the defendant, the detective emphasized that "there's a lot of things we need to get through about what happened tonight, but we can't talk unless you agree to talk to us right now." (Internal quotation marks omitted.) Id., 173. We concluded in that case that this statement clarified that the defendant would have to waive his *Miranda* rights in order for the conversation to continue and that his "express waiver of his *Miranda* rights following [that] explanation manifested the defendant's clear and unequivocal desire to proceed with the interview without the presence of counsel." Id., 187. We conclude that Brownell's statement that the defendant would get an attorney in court, "[b]ut . . . you said you wanted to talk about something," is less coercive than the statement we found acceptable in *Culbreath*.

Significantly, here, any potential confusion that Brownell's additional comments may have caused was minimized when Brownell expressly stated, "if you are not comfortable talking to me right now without the attorney, that's your choice. I understand that." Through this statement, Brownell clarified that the defendant need not proceed with the September 24 interview with

State *v.* Johnson

out the presence of an attorney and that Brownell would honor the defendant's decision.[9] Brownell's comments could not have been designed to convince the defendant that it was against his interest not to continue the September 24 interview when Brownell very clearly and very directly told the defendant that, if he was not comfortable speaking with him without a lawyer, the interview would stop. And, again, there is no evidence that the defendant made any further request for counsel, equivocal or otherwise, after he wrote his initials and specifically waived his right to have counsel present.

Although a more direct response—the answer "yes"—would have been a preferable response to the defendant's initial inquiry about whether he could have an attorney, we conclude that, under the circumstances of this case, Brownell did not exceed the permissible scope of responses to an equivocal request for counsel. Because he clarified the defendant's equivocal request for counsel by both reissuing the *Miranda* advisement and securing a signed waiver before conducting any further questioning, Brownell complied with *Purcell*. Therefore, the defendant's rights were not violated under article first, §8, of the Connecticut constitution and this court's decision in *State* v. *Purcell*, supra, 331 Conn. 362.

III

The defendant also claims that the trial court improperly denied his motion to suppress his cell phone records and all evidence derived therefrom, including location data. He contends that the warrant authorizing the

---

[9] Among other related reasons, we implemented *Purcell*'s "stop and clarify rule" to further the purpose of *Miranda* warnings, which is "to show the individual that his interrogators are prepared to recognize his privilege[s] should he choose to exercise [them]." (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 359–62, quoting *Miranda* v. *Arizona*, supra, 384 U.S. 468. We note that Brownell's statement accords with this purpose. Brownell had also demonstrated just a few hours earlier that he would honor the defendant's request to stop talking if he so chose.

State *v.* Johnson

search and seizure of his cell phone records did not comport with the fourth amendment to the United States constitution[10] and article first, § 7, of the Connecticut constitution.

First, the defendant argues that the search warrant was not supported by probable cause because nothing in the accompanying affidavit established a nexus between his cell phone records and the victim's murder. Second, the defendant argues that the warrant lacked particularity because it authorized the search and seizure of the entirety of his cell phone records over a five week period, without establishing how each record was related to the murder investigation. We are not persuaded and, therefore, conclude that the trial court properly denied the defendant's motion to suppress his cell phone records.

The following facts and procedural history are relevant to our analysis. During their investigation, the police sought and obtained a search warrant for the cell phone records relating to the defendant's cell phone number. More specifically, the following information was requested: "T-Mobile telephone records for the number 347-5xx-xxxx including, but not limited to: subscriber information, call detail records with cell site information, [Internet protocol (IP)] addresses for [Voice over Internet Protocol (VoIP)] calls, voice records, data records with cell site information, [short message service (SMS)] detail records, historical [Global Positioning System (GPS)] locations for the time period of 07/10/2020 through the date of 08/14/2020; and any precision location data and [Time Difference of Arrival (TDOA)] or Timing Advance Information when the phone was powered on between 07/10/2020 and 07/20/2020. All cell phone devices

_____

[10] The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

State *v.* Johnson

attached to the subscriber/account information related to the phone number of 347-5xx-xxxx."

The search warrant affidavit contained the following factual allegations, among others. An Uber dropped off the victim at her apartment in the early morning hours of July 10, 2020. Three days later, Modongo reported the victim as missing because he had not seen her or heard from her since July 10, 2020. On August 14, 2020, the victim's roommate returned to their apartment and reported that the victim was still missing. Throughout the ensuing investigation, "no family or friends ha[d] seen or heard from [the victim] in any manner," and several of these individuals had reported that the lack of contact with the victim was unusual. On September 12, 2020, decomposed human remains were discovered with "female clothing" and artificial fingernails similar to those that appeared in a photograph of the victim.

In a written statement voluntarily given to the police on September 18, 2020, the defendant explained that he had a relationship with the victim. The defendant also "mentioned that [the victim] called him a few days after [July 11, 2020]," and, during their brief conversation, the victim "sounded upset" and said that "she wanted everyone to leave her alone . . . ." When the police first spoke to the defendant over the phone, he indicated a desire "to file a harassment report [against the victim's] boyfriend," Modongo, for repeatedly calling him to ask where the victim was. Screenshots of WhatsApp messages that were obtained by the police revealed that the defendant texted Modongo that he last spoke to the victim on July 15, 2020.

The search warrant affidavit further provided that the victim's conversation with the defendant "was the last phone conversation [the victim] had on her phone before she was reported missing" on July 13, 2020, and that "[n]o other phone conversation was found in the records provided [in which the defendant] and [the victim] spoke again, like [the defendant] claimed . . . ." The affiants averred that, based on the alleged facts, probable cause

State *v.* Johnson

existed to believe that the crime of murder had been committed and that evidence of that offense may be located in the requested records.

Prior to trial, the defendant filed a motion to suppress his cell phone records, and all evidence obtained therefrom, because the warrant **(1)** lacked particularity, **(2)** was overly broad, and **(3)** did not establish probable cause. After a hearing, the trial court denied the defendant's motion. On appeal, the defendant argues that the trial court improperly denied his motion to suppress because the warrant was not supported by probable cause and lacked particularity.

Under both the fourth amendment to the United States constitution and article first, §7, of the Connecticut constitution, "[p]robable cause to search is established if there is probable cause to believe that **(1)** . . . the particular items sought to be seized are connected with criminal activity or will assist in a particular . . . conviction . . . and **(2)** . . . the items sought to be seized will be found in the place to be searched." **(**Internal quotation marks omitted.**)** *State* v. *Evans*, 352 Conn. 794, 816–17, 339 A.3d 1138 (2025). "Probable cause requires less than proof by a preponderance of the evidence . . . . The task of the issuing [judge] is simply to make a practical, [commonsense] decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." **(**Internal quotation marks omitted.**)** Id., 817. Furthermore, "[g]iven the inextricable connection between people and their cell phones," probable cause for a cell phone's location data exists when the affidavit "establish[es] probable cause that a suspect committed a crime and facts that the suspect is known to use or possess a particular cell phone . . . ." Id., 819.

Next, the particularity requirement is satisfied if the warrant "identifies the place or thing for which there is probable cause to search with sufficient definiteness to preclude indiscriminate searches." **(**Internal quotation marks omitted.**)** *State* v. *Smith*, 344 Conn. 229, 249,

122 FEBRUARY, 2026 354 Conn. 96

State *v.* Johnson

278 A.3d 481 (2022). "[T]he particularity requirement has three components. First, a warrant must identify the specific offense for which the police have established probable cause. . . . Second, a warrant must describe the place to be searched. . . . Third, the warrant must specify the items to be seized by their relation to the designated crimes." (Internal quotation marks omitted.) Id.

Whether a warrant satisfies the constitutional requirements of probable cause and particularity presents a question of law over which our review is plenary. See, e.g., *State* v. *Buddhu*, 264 Conn. 449, 459, 467, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004). "In evaluating whether [a] warrant was predicated on probable cause . . . [reviewing] [c]ourts . . . [defer] to the reasonable inferences that the issuing judge could have and did draw . . . and . . . uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [judge's] conclusion that probable cause existed." (Citations omitted; internal quotation marks omitted.) *State* v. *Evans*, supra, 352 Conn. 817.

With these legal principles in mind, we address whether the warrant for the defendant's cell phone records was constitutionally valid. We first consider the defendant's claim that the warrant was not supported by probable cause. In support of this claim, the defendant asserts that the accompanying affidavit failed to allege sufficient facts to establish a nexus between his cell phone records and the victim's murder. We disagree.

The defendant's argument is based on his view that the only fact connecting him to the victim's murder was that he was the last person to call the victim's cell phone before her disappearance. On the basis of our review of the search warrant affidavit, we conclude that the police averred additional facts, along with the defendant's status as the last caller, that together established a fair probability that evidence relating to the victim's murder would be found in the defendant's cell phone records. In particular, the defendant was involved in a sexual

354 Conn. 96 FEBRUARY, 2026 123

State *v.* Johnson

relationship with the victim and was allegedly the only person who had contact with the victim after she was first reported missing. In addition, his assertion that he spoke to the victim on July 15, 2020, five days after she went missing on July 10, 2020, became highly suspicious when the police discovered that the victim's call records did not show a call with the defendant after July 11, 2020. Given those circumstances, it was reasonable to infer that the defendant was lying about the last time that he had spoken to the victim.

Furthermore, because the defendant reported that the victim "wanted everyone to leave her alone" and indicated that he wished to file a harassment report against Modongo for his repeatedly calling to ask about the victim's whereabouts, the police could have reasonably believed that the defendant exhibited a suspicious desire to detract attention from himself. We conclude that these facts in the search warrant affidavit, together with the reasonable inferences that could be drawn therefrom, established a fair probability that the defendant was involved in the victim's murder. Because the defendant was known to possess a particular cell phone and he had relevant communications with both the victim and Modongo via that cell phone, there was probable cause that the defendant's cell phone records would contain evidence of the victim's murder.[11] See, e.g., *State* v. *Evans*, supra, 352 Conn. 819.

Next, the defendant contends that the warrant fails for lack of particularity because it permitted the search and seizure of five weeks of his cell phone records, without demonstrating how each record during that time period was relevant to the murder investigation. We disagree. As we explain hereinafter, the warrant at issue satisfies the particularity requirement because it sought a list of specific records, over a relevant time frame, that

_____

[11] Because we conclude that probable cause existed for all of the requested cell phone records, we need not address the state's argument that the defendant had a reasonable expectation of privacy only in his location data and not in the remaining records enumerated in the warrant.

State *v.* Johnson

was sufficiently limited and connected to the factual circumstances surrounding the victim's murder. Cf., e.g., *State* v. *Smith*, supra, 344 Conn. 251–52, 258.[12]

First, the warrant provided a sufficiently limited list of the specific records to be searched. The warrant requested records associated with the defendant's cell phone number and enumerated the categories of records sought, including "subscriber information, call detail records with cell site information, IP addresses for VoIP calls, voice records, data records with cell site information, SMS detail records, historical GPS locations . . . [as well as] precision location data and TDOA or Timing Advance Information . . . ." Each of these records was related to the murder investigation and the probable cause justifying the search. The subscriber information would confirm that the defendant was the T-Mobile subscriber. The records of the defendant's calls and messages were relevant to questions about his communications with the

---

[12] In *State* v. *Smith*, supra, 344 Conn. 229, we reviewed the constitutionality of two warrants: one seeking the contents of a cell phone, and one seeking cell phone records. See id., 233–34, 239–40.

We observed that, to be sufficiently limited, a warrant for the contents of a cell phone should "list [the] types of data [the] particular device or cell phones in general contain, and the types of data on the phone the affiants sought to search and seize, such as cell phone call logs, text messages, voice messages, photographs, videos, communications via social media, or other evidence of the crime[s]" for which the police have probable cause. Id., 251–52. Further, the scope of the search must be restricted "by a time frame reasonably related to the crimes." Id., 252. Accordingly, we concluded that a warrant for the contents of the defendant's cell phone was not sufficiently particular when it authorized a search of " 'data extraction' " with no time parameters. Id., 251–52.

Although we concluded that the warrant for the defendant's cell phone records was invalid for lack of probable cause; id., 257; we noted that the warrant was "more likely to satisfy the . . . particularity requirement." Id., 258. The warrant listed the items to be searched and seized as "SMS text messages, [email] information and messages, social media messages, video recordings, digital images, voice mail recordings, GPS data, [g]eolocator, and any other data/information stored on the [device], [i]nternal memory or removable storage media, and/or any data the [device] has access to through a cellular [n]etwork/[Wi-Fi]/Bluetooth connection." (Internal quotation marks omitted.) Id. Further, the scope of the search was limited by an eighteen day time frame "reasonably connected to the [crimes]" because the "dates correlate[d] to approximately one day before [the first crime was committed] up until the date the defendant was arrested." Id.

354 Conn. 96 FEBRUARY, 2026 125

State *v.* Johnson

victim and Modongo, including whether he had a phone conversation with the victim after July 11, 2020. The remaining location information was relevant to establishing whether and when the defendant had traveled to the victim's apartment and Black Rock State Park, where the victim's remains were discovered.

Given the circumstances of the murder investigation, the time period for which the police requested the defendant's cell phone records was sufficiently limited. The defendant argues that, because the warrant sought records covering several weeks after the victim disappeared, it failed to adequately cabin the scope of the search. We disagree because "the constitutionality of [the police officers'] conduct [must be judged] in light of the information available to them at the time they [obtained the warrant]." *Maryland* v. *Garrison*, 480 U.S. 79, 85, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). At the time the police applied for and obtained the warrant, on September 21, 2020, the police had insufficient information to identify a precise time frame during which the murder may have occurred. Essentially, the police knew only that the murder happened sometime between July 10, 2020, when the victim was last seen, and September 12, 2020, when the victim's remains were discovered. Because the state of the victim's remains suggested that the murder occurred well before September 12, 2020, it was reasonable for the police to request records up until August 14, 2020, which was about one month before her body was found and the day that her roommate reported that she was still missing. Therefore, given the available information, the warrant's time frame from July 10 to August 14, 2020, was sufficient to cabin the scope of the search.

The defendant contends that the warrant authorized a general search of all of his cell phone records due to its use of the phrase "including, but not limited to . . . ." The state responds that the use of this phrase merely reflects the reality that the police may not know exactly where digital evidence may be found. In *State* v. *Correa*, 353 Conn. 338, 341 A.3d 910 (2025), we reviewed a warrant

State *v.* Johnson

that authorized a search for "all data contained [in the defendant's cell phone] . . . including, but not limited to," certain listed items and that did not include any time parameters to limit the search. (Internal quotation marks omitted.) Id., 363–64. We concluded that the warrant was not particular because, like the warrant seeking the contents of a cell phone in *State* v. *Smith*, supra, 344 Conn. 251–52, "the warrant effectively authorized a search of the entire contents of the cell phone, regardless of the type of information or the date the information was created or received." (Internal quotation marks omitted.) *State* v. *Correa*, supra, 364.

Here, by contrast, the warrant authorized a search of only the defendant's cell phone records that were in T-Mobile's possession and were created within a limited time period. It did not allow the police to access all data contained within the cell phone, like the warrants in *State* v. *Correa*, supra, 353 Conn. 363–64, and *State* v. *Smith*, supra, 344 Conn. 251–52. For these reasons, we conclude that the "including, but not limited to" phrase did not render the warrant unparticular. See, e.g., *State* v. *Correa*, supra, 365 ("even if the police have difficulty knowing in advance where certain content may be located in a phone, providing reasonably tailored limits on the time and types of information that the police can search in the warrant application may help the state avoid constitutional infirmities").

Because the warrant was supported by probable cause and was sufficiently limited, we conclude that it was constitutionally valid. Therefore, the trial court properly denied the defendant's motion to suppress his cell phone records.

The judgment is affirmed.

In this opinion ALEXANDER, DANNEHY and BRIGHT, Js., concurred.

State *v.* Johnson

D'AURIA, J., with whom McDONALD and ECKER, Js., join, dissenting in part. In *State* v. *Purcell*, 331 Conn. 318, 203 A.3d 542 (2019), this court departed from federal constitutional law and unanimously held that, when the police are confronted with ambiguity in a suspect's invocation of his right to counsel during a custodial interrogation, our state constitution provides greater protection than its federal counterpart and demands that an interrogating officer either cease questioning the suspect altogether, or limit any further questioning to one subject: clarifying the suspect's statement and desire for counsel. See id., 321, 362. With today's decision, a majority of this court has broadened the scope of permissible responses to a suspect's equivocal request for counsel in a way that, in my view, allows an interrogator to defer and deflect a suspect's specific invocation of his right to counsel as long as the interrogator has ultimately repeated all of the *Miranda*[1] rights and secures a new written waiver.

In my view, the majority's holding departs significantly from—in fact dilutes—our very recent precedent in *Purcell*. As important, today's decision is antithetical to the policies that animate *Miranda* itself, policies intended to minimize opportunities for the police to take advantage of a suspect's custody—a status we recognize as inherently coercive, where often the suspect's only access to information is through the police officer conducting the interrogation. The majority's choice to justify the interrogating officer's response to the defendant, Miles Johnson, in the present case might sound academically satisfying. After all, the officer obtained a second signed *Miranda* waiver even after the suspect brought up (and arguably requested) the presence of counsel. But it is a choice that, in practice, makes room for skillful, tactical police work at a time—after an equivocal request for counsel—when our precedent says there should be room only for clarification. It is true that, after asking whether he could have a lawyer

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State *v.* Johnson

present, the defendant in the present case, having been reread his *Miranda* rights and having executed a second written waiver, agreed to talk to the officer without the presence of counsel at the police station before being transported to court for arraignment. But he waived those rights laboring under the misapprehension that he *could not* have counsel present at the police station because the officer told him: "That's something that would happen over at court." I can find nothing in the majority opinion that addresses this reality or explains how the defendant's waiver could be knowing and intelligent when the only governmental representative he was dealing with provided this misinformation.

Because, in my view, the majority distorts the clear command of *Purcell* and weakens its protections, I respectfully dissent from part II of the majority opinion. Instead, I conclude that, because the interrogating officer failed to properly stop and clarify the defendant's equivocal request for counsel, as required by article first, §8, of the Connecticut constitution and *Purcell*, the trial court should have granted the defendant's motion to suppress evidence related to his September 24, 2020 interview. Because I also conclude that the state has failed to demonstrate that the trial court's error was harmless beyond a reasonable doubt, I would reverse the trial court's judgment and remand the case for a new trial. I do not reach the issues raised in parts I or III of the majority opinion and therefore respectfully dissent in part.

I

To protect individuals from "overzealous police practices," the United States Supreme Court held, in *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), a decision fixed firmly in our national consciousness, that, during a custodial interrogation and "[p]rior to any questioning," among other procedural safeguards that states must honor, an accused must be advised "that he has a right to the presence of an attorney, either retained or appointed." Id., 444. Although he

354 Conn. 96          FEBRUARY, 2026          129

State *v.* Johnson

may choose—voluntarily, knowingly and intelligently—to waive this right, *Miranda* and its federal progeny demand that, if a suspect indicates "in any manner and at any stage of the process" that he wants to consult an attorney, there can be no more questioning until counsel is made available, unless the accused initiates further conversations with the police. Id., 444–45; see *Michigan* v. *Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990); see also *Edwards* v. *Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (once accused invokes right to counsel, interrogation must stop "until counsel has been made available to him, unless the accused himself initiates further communication" with police). In *Edwards* v. *Arizona*, supra, 485, the court held that questioning must cease when a suspect has "clearly asserted" his right to counsel, but, until the court decided *Davis* v. *United States*, 512 U.S. 452, 458–60, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), it had not described precisely how the police must treat ambiguous or equivocal requests for counsel.

Before *Davis*, lower courts were divided on how to treat equivocal requests for counsel during custodial interrogations. Courts had developed three distinct approaches: (1) immediate cessation of the interrogation, (2) continued interrogation until a sufficiently clear invocation is made, and (3) a stop and clarify approach, permitting questions limited to clarifying the suspect's intent. See *State* v. *Purcell*, supra, 331 Conn. 332; see also *Smith* v. *Illinois*, 469 U.S. 91, 96 n.3, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). For more than one decade before *Davis*, Connecticut endorsed the third approach, holding that federal constitutional law required officers to stop and clarify an ambiguous request for counsel. See, e.g., *State* v. *Anderson*, 209 Conn. 622, 627–28, 553 A.2d 589 (1989); *State* v. *Barrett*, 205 Conn. 437, 448, 534 A.2d 219 (1987); *State* v. *Acquin*, 187 Conn. 647, 674–75, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983); see also *United States* v. *Gotay*, 844 F.2d 971, 974–75 (2d Cir. 1988) (adopting clarification approach endorsed by several

State *v.* Johnson

other federal courts of appeals), overruled in part on other grounds by *Davis* v. *United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). "We reached this determination based on our conclusion that this rule was compelled under Supreme Court precedent." *State* v. *Purcell*, supra, 347.

In *Davis*, the United States Supreme Court tempered *Miranda*'s federal constitutional safeguards, holding that an interrogation must cease only following a unambiguous or unequivocal request for counsel. See *Davis* v. *United States*, supra, 512 U.S. 462 ("[m]aybe I should talk to a lawyer" was not unambiguous request for counsel (internal quotation marks omitted)). We have recognized for decades that *Davis* constituted a change in the law, in that it "narrowed" *Miranda* "by holding that an accused's request for counsel under *Miranda* must be objectively unequivocal." *State* v. *Anonymous*, 240 Conn. 708, 720–21, 694 A.2d 766 (1997); see also *State* v. *Purcell*, supra, 331 Conn. 353 (characterizing *Davis* as "change in the law").

In *State* v. *Purcell*, supra, 331 Conn. 341, we addressed a defendant's claim that our state constitution provided greater protection than the federal rule that has adhered since *Davis*. We articulated our disagreement with both the logic of the *Davis* standard and the "soundness of the policy rationale supporting" that five to four decision. Id., 351, 353. We reasoned that an "unequivocal" standard incorrectly assumes that individuals not only comprehend their *Miranda* rights and the effect of invoking them but also that they understand they must exercise them in a specific way. See id., 354–56; see also id., 355 (question of whether suspects understand *Miranda* rights is largely distinct from whether they know "the unequivocal manner in which they would have to exercise those rights to give them effect" (emphasis omitted)). We recognized that the *Davis* standard disadvantages more vulnerable individuals[2] who are less likely

[2] See *Davis* v. *United States*, supra, 512 U.S. 470 n.4 (Souter, J., concurring in the judgment) ("Social science confirms what common

354 Conn. 96 FEBRUARY, 2026 131

State *v.* Johnson

to unambiguously invoke their rights and are most at risk of succumbing to coercive pressures against which *Miranda* was intended to protect. See id., 321, 356–57; see also id., 321 ("Connecticut constitution does not condone a rule that could disadvantage the most vulnerable of our citizens"). We explained that the *Davis* standard exacerbates the existing threat to *Miranda* protections posed by more subtle forms of psychological coercion and noted that, "[b]y permitting interrogation to continue in the face of an ambiguous invocation of the right to counsel, the police officers faced with such an invocation have [under *Davis*] been emboldened to employ a wide range of tactics designed to deflect suspects from clearly invoking their right to an attorney." Id., 360. Allowing officers "to press forward with interrogation in the face of a statement that a suspect reasonably believes to be an invocation of his [*Miranda*] right to have counsel present"; id., 346—but that does not match the precise phrasing that reviewing courts have deemed unequivocal—leads those in custody to reasonably infer that the rights they had been advised of are for some reason ineffective, or that the police do not intend to recognize them. See id., 360. Such an inference is likely to dissuade suspects from persisting in attempting to invoke guaranteed privileges. Id. We therefore concluded unanimously in *Purcell* that *Davis*' " 'clear and unequivocal' standard"; id., 321; fails

sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant. See W. O'Barr, Linguistic Evidence: Language, Power, and Strategy in the Courtroom [(1982) pp.61–71] . . . ."); see also S. Baker et al., "A Critical Discussion of Youth *Miranda* Waivers, Racial Inequity, and Proposed Policy Reforms," 29 Psych. Pub. Policy & L. 320, 326 (2023) ("Youth of color, who are more likely to be financially vulnerable than their White counterparts . . . may hesitate to assert their right to legal counsel because they (a) have not been informed that these services will be provided at no cost, (b) do not have the familial financial resources to secure an attorney, or (c) may have experienced or witnessed others (e.g., family members) receive a substantial bill for court-appointed counsel. . . . White youth whose families have the financial means to hire an attorney commonly have one intervene before interrogation can occur. On the contrary, youth of color often do not have families with the financial means or connections needed to hire an attorney privately and quickly following arrest.").

State *v.* Johnson

to adequately safeguard a suspect's right to the advice of counsel during a custodial interrogation and indeed is antithetical to the purpose of *Miranda* warnings, which is to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." (Internal quotation marks omitted.) Id., quoting *Miranda* v. *Arizona*, supra, 384 U.S. 468.

Our holding in *Purcell* is consistent with this state's time-honored recognition "that the due process concerns that operate at the intersection between the right to counsel and the privilege against self-incrimination may require greater protection than that afforded by the federal constitution under some circumstances" and of the significance of the right to counsel dating back to "before that right attained federal constitutional importance." (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 345. For example, this court has held that our state constitution forbids police interference with an individual's exercise of his right to counsel under circumstances that the federal constitution does not. See *State* v. *Stoddard*, 206 Conn. 157, 164–72, 537 A.2d 446 (1988) (declining to follow United States Supreme Court in *Moran* v. *Burbine*, 475 U.S. 412, 421–23, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), in holding that due process clause of Connecticut constitution requires police to inform suspect of timely efforts by counsel to provide legal assistance). In *Purcell*, we joined several other jurisdictions[3] in declining to follow the *Davis* standard as a matter of our state's constitutional law, endorsing instead the "stop and clarify" approach that a majority of jurisdictions, including Connecticut, fol-

[3] See, e.g., *Steckel* v. *State*, 711 A.2d 5, 10–11 (Del. 1998); *State* v. *Hoey*, 77 Haw. 17, 36, 881 P.2d 504 (1994); *State* v. *Risk*, 598 N.W.2d 642, 648–49 (Minn. 1999); *Downey* v. *State*, 144 So. 3d 146, 151–52 (Miss. 2014); see also *State* v. *Chew*, 150 N.J. 30, 62–63, 695 A.2d 1301 (1997) (adopting stop and clarify approach based on New Jersey common law rather than constitutional privilege to protect accused's right to counsel and against self-incrimination) (overruled in part on other grounds by *State* v. *Boretsky*, 186 N.J. 271, 894 A.2d 659 (2006)), cert. denied, 528 U.S. 1052, 120 S. Ct. 593, 145 L. Ed. 2d 493 (1999).

State *v.* Johnson

lowed before *Davis*, which was designed to require that officers "dispel ambiguity and avoid guesswork as to the suspect's actual intent" without coercing or continuing to interrogate him. *State* v. *Purcell*, supra, 358.

Therefore, we held in *Purcell*, citing cases we decided before *Davis* under the federal constitution, that, under the Connecticut constitution, when a suspect makes a statement that can arguably be construed as a request for counsel, interrogators have two options. First, they may cease the interrogation, "except for narrow questions designed to clarify *the earlier statement and the suspect's desire for counsel*." (Emphasis added; internal quotation marks omitted.) Id., 362, quoting *State* v. *Anderson*, supra, 209 Conn. 628. Alternatively, interrogators may "inform the defendant that they understand his statement(s) to mean that he does not wish to speak with them without counsel present and that they will terminate the interrogation." *State* v. *Purcell*, supra, 331 Conn. 362. "In either case," the interrogation may resume only "if the defendant thereafter clearly and unequivocally expresses a desire to continue without counsel present . . . ." Id., citing *State* v. *Acquin*, supra, 187 Conn. 669–70.

II

In my view, Detective Steven Brownell's response to the defendant in the present case failed to comply with *Purcell*, and not merely in a "technical" sense as the majority suggests. Rather, the undisputed facts of the present case provide an apt illustration of how, by failing to adhere to *Purcell*'s stop and clarify rule—and, in this case, by providing misinformation about how and when the suspect may exercise his right to counsel—an interrogating officer can deflect a suspect's requests for counsel and delay any invocation of that right, resulting in a waiver that is not knowing and intelligent. In my view, on this record, simply rereading the defendant his rights did not cure this breach of the *Purcell* rule because, objectively, Brownell's response left the defendant with the misconception that any continued discussion at the

State *v.* Johnson

police station would have to proceed without the presence of counsel.

Brownell first interviewed the defendant in the late evening of September 23, 2020, after Brownell had read, and the defendant had waived, his *Miranda* rights. At about 2 a.m. the next morning, the interview ended with the following exchange:

"[The Defendant]: Since I'm being arrested, sir, I doubt if an attorney makes any sense, but—

"[Brownell]: Okay. You are all done talking about it?

"[The Defendant]: I'm done talking, sir. Because I'm being arrested, sir."

The defendant was then arrested, taken into custody, and held overnight at the Waterbury police station. Later that morning, at about 8 a.m. on September 24, 2020, the defendant was in the holding area of the detective squad room, waiting to be transported to court for his arraignment later that morning. When the defendant saw Brownell, he motioned for him to come over and asked what was happening. Brownell told the defendant that he was going to court, at which point the defendant "indicated that he wished to speak to [Brownell] further." Brownell escorted the defendant to an interview room, where the defendant initiated the following discussion, which was captured on the police department's video recording equipment:

"[The Defendant]: I can't have a lawyer present, right?

"[Brownell]: Huh?

"[The Defendant]: Can I have a lawyer present, or no?"

At this point in the conversation, under our state constitution and our decision in *Purcell*, if the defendant's questions, reasonably construed, created any doubt that the defendant was requesting the presence of counsel,[4]

_____

[4] The parties and the trial court apparently accepted that the questions the defendant posed to Brownell ("I can't have a lawyer present, right," and "[c]an I have a lawyer present, or no") constituted an equivocal

354 Conn. 96 FEBRUARY, 2026 135

State *v.* Johnson

the officer either had to stop and clarify the defendant's request with narrowly tailored questions or inform the defendant that he would treat his inquiry as an invocation of his right to counsel and terminate the interview. See *State* v. *Purcell*, supra, 331 Conn. 362. Brownell did neither. Instead, he responded, "[i]f you wanted a lawyer right now, it's going to happen when you go over to court, is what it boils down to, okay?" This was not only not "the best response," as the majority acknowledges, it was also factually inaccurate and legally insufficient.

An accurate answer to the defendant's question (which he repeated twice) would have included an affirmative, such as: "Yes, you have a right to have a lawyer present while we talk." The majority concedes this much. Brownell might have been laboring under the groundless (and mistaken) assumption that the defendant could not afford private counsel who might have been available to come to the police station without delay. Or, more generally, perhaps Brownell assumed (right or wrong) that a lawyer could not be summoned to the police station

request for counsel. The majority has also treated the defendant's request as equivocal. I do not find this assumption to be at all obvious, however, taking account of our observation in *Purcell* that many individuals, particularly those in certain suspect or quasi-suspect classes, commonly rely on indirect speech patterns "as a linguistic mechanism to avoid conflict." (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 357. Such "hedges in speech . . . may be used to convey either that the speaker is uncertain about the statement or that the speaker prefers not to confront the addressee with a bald assertion." Id. In my view, the defendant's direct, closed-ended question, posed to a detective who, in this interaction, personified the law and our state government, while the defendant sat in handcuffs, can just as easily be considered an unambiguous and unequivocal request for the presence of counsel during any further conversation, even one that the defendant initiated. That request was met with an incorrect answer: "If you wanted a lawyer right now, it's going to happen when you go over to court, is what it boils down to, okay?" Nevertheless, because I conclude that Brownell did not comply with *Purcell*, and that the trial court, on this record, should have suppressed the statements the defendant made on September 24, 2020, I will eschew any scrupulous review of the factual record that might lead to a different conclusion about the clarity of the defendant's invocation of his right to counsel, and I, too, will assume that these questions constituted equivocal invocations of that right.

State *v.* Johnson

before the defendant's departure for his arraignment at court later that day. Whatever the source of Brownell's inaccurate and nonresponsive answer to the defendant's inquiry, a suspect's rights do not have to accommodate the officer's assumptions. To the contrary, in pursuit of *Miranda*'s purpose, which is to ensure that a suspect understands his rights before waiving them, the law demands that we focus on the rights of the accused, not the assumptions of the police, even if made in good faith. See, e.g., *State* v. *Stoddard*, supra, 206 Conn. 170 ("[t]he focus must be on the rights of the accused, not the innocence or culpability of the police" (internal quotation marks omitted)); see also *State* v. *Marsala*, 216 Conn. 150, 171, 579 A.2d 58 (1990) (exception to right to be free from unreasonable searches and seizures that accounts for good faith of police officers is incompatible with state constitution). This is precisely why, at this juncture, *Purcell* demands that the officer "avoid guesswork as to the suspect's actual intent" and ask narrow questions "designed to clarify" the suspect's desire for counsel, or assume the suspect has asked for counsel and not engage any further. (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 358, 362.

Instead, Brownell engaged in expert police work (if it passes constitutional muster with this court) by posing an open-ended invitation to the defendant: "When I came in, I saw you in the holding room there, and you said that you wanted to talk about something . . . ." The defendant's initial response did not manifest agreement that he wanted to talk with Brownell. Rather, he responded: "No, I was just asking." Brownell then continued to discuss the defendant's desire to keep talking[5] before

---

[5] "[Brownell]: So, to be crystal clear, when we ended last night, you said that you were done talking, okay?

"[The Defendant]: Okay.

"[Brownell]: And, this morning, you said that there was something that you wanted to talk about, is that clear—I mean, is that fair?

"[The Defendant]: That's fair, yeah.

"[Brownell]: What we have to do is, since last night you wanted to stop talking, this morning you want to talk again, I just got to go over the same rights again. It's the same thing as last night, okay?"

State *v.* Johnson

rereading the defendant the *Miranda* warnings and securing his signature on the waiver form again. After the defendant signed the waiver form, which included an explanation of his right to counsel, Brownell continued: "Okay. Do you understand those? I know you mentioned having an attorney when we first got here. Okay. *That's something that would happen over at court.* So, if you are not comfortable talking to me right now without an attorney, that's your choice. I understand that. But what you said you wanted to talk about something, okay?" **(**Emphasis added.**)**

Thus, both before and after readvising the defendant of his *Miranda* rights and securing a second written waiver, Brownell presented the defendant with a confusing and inaccurate false choice—he could have a lawyer, but only later, after he arrived at court. If he wanted to talk to the detective at the police station, it would have to be without a lawyer present. Under any objective standard, the conditional nature of Brownell's explanation would "dissuade [the defendant from] subsequent efforts to renew [his] privilege" to have counsel present prior to leaving for court. *State* v. *Purcell*, supra, 331 Conn. 360. At that point, the defendant agreed to submit to further questioning without counsel present. He did so for nearly one hour, stopping only when an attorney, who the defendant's mother had hired, called and directed Brownell to cease the interrogation. As I explain in part III of this opinion, I do not agree with the majority that Brownell's responses to the defendant's questions pass constitutional muster under the law of this state.

III

Although the majority acknowledges some deficiency in Brownell's responses, it goes to great lengths to defend them because the majority "understand[s]" the detective's statements to be mere attempts to explain to the defendant the "practicalities" of the situation. Part II of the majority opinion. To the majority, Brownell's failure to advise the defendant that he was permitted to have an attorney present while submitting to any further

State *v.* Johnson

questioning before going to court is justified because it was "practically improbable" that counsel could be arranged before the defendant departed for court. Id. I am not convinced that a failure to respond directly and accurately to the defendant's supposedly equivocal request for counsel can be so easily dismissed, or that Brownell's response here was simply an attempt to explain logistical constraints as opposed to skillful police work intended to keep the defendant talking, notwithstanding his expressed preference to do so with a lawyer present. The majority goes on to hold that any deficiency in Brownell's response was cured by his repetition of the defendant's *Miranda* rights "in their totality." Id. I disagree with both of the majority's conclusions and consider them to be inconsistent with, and indeed a retreat from, our holding in *Purcell.*

A

First, on this record, I do not accept that the "practicalities" the majority describes—that the defendant "was waiting to be transported to court for his arraignment, where an attorney indeed would be appointed"; id.—justified Brownell's inaccurate response to the defendant. *Miranda* requires that police advise a suspect "that he has a right to the presence of an attorney, either *retained* or appointed." (Emphasis added.) *Miranda* v. *Arizona*, supra, 384 U.S. 444. With its interpretation of Brownell's response as an attempt to explain the "current circumstances" to the defendant, the majority necessarily accepts and defends Brownell's assumption, without either scrutiny or supporting evidence, that the defendant was requesting *appointed* counsel, who could not have been summoned to the police station before the defendant's departure for court. Nothing in the record suggests nor did Brownell ask any clarifying questions that would justify the assumption, that, when the defendant asked, "[c]an I have a lawyer present, or no," he must have meant, "when will I be appointed a lawyer?" In my view, as a matter of our state constitutional law, incorporating the presumptions and estimations of an

354 Conn. 96 FEBRUARY, 2026 139

State *v.* Johnson

interrogator in response to an equivocal request for counsel is foreign to the purpose of clarification and therefore impermissible under *Purcell.* See, e.g., *Thompson* v. *Wainwright*, 601 F.2d 768, 772 (5th Cir. 1979), overruled in part on other grounds sub silentio by *Davis* v. *United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). Had the defendant been dressed in a suit and tie, or if any member of this court were to find themselves in the defendant's position, I doubt seriously that the courts of this state would accept either the presumption that they could not promptly summon an attorney to the police station or the officer's explanation that they would need to wait until their arraignment to have counsel appointed and therefore would have to speak without counsel present if they wanted to do so at the police station. *Miranda* rests on the "egalitarian premise" that all suspects are entitled to know their rights, not only the sophisticated or astute. *State* v. *Stoddard*, supra, 206 Conn. 169. Consequently, no individual in this state should be afforded any less protection or subjected to a different assumption simply because they do not understand that they must exercise their rights in a specific way to give them effect. In fact, Brownell's assumption proved to be incorrect in this case. Within one hour, while Brownell continued to question the defendant and while the defendant's transport to court apparently idled, belying any exigency, counsel hired by the defendant's mother succeeded in contacting Brownell to instruct him to cease the interview.

I acknowledge that, at times, in the pursuit of clarifying a suspect's request for counsel, it may be pertinent for an interrogating officer to include in his response an explanation of the logistics or practical consequences of invoking this right. Those explanations are often perilous, however, and interrogating officers must take care that they do not result in coercion or intimidation. See, e.g., *Thompson* v. *Wainwright*, supra, 601 F.2d 772 ("[b]ut even such explanations are perilous and, if given, must not be materially incorrect"). In many instances in which officers have attempted to explain the bureaucratic

State *v.* Johnson

complexities, logistics, or practicalities of invoking the right to counsel, courts have held that the explanations exceeded the bounds of proper clarification and crossed into obfuscation and coercive attempts to persuade the suspect to continue the interrogation. See, e.g., id. (police officer's indication that attorney would not let suspect tell police his side of story served to persuade suspect to talk to police rather than to discern meaning of suspect's statement); *Hampel* v. *State*, 706 P.2d 1173, 1182 (Alaska App. 1985) (interrogating officer's emphasis on delay and bureaucratic complexity of procuring counsel while focusing on evidence against suspect worked to persuade suspect to talk to police rather than to clarify ambiguous request for counsel).

In *Purcell* itself, the defendant made two equivocal requests for counsel: "See, if my lawyer was here . . . then . . . we could talk. That's, you know, that's it"; and "I'm supposed to have my lawyer here. You know that." (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 334. We held that the interrogating officer in that case had failed to seek proper clarification of the suspect's desire for counsel, violating the suspect's state constitutional rights, when the officer stated, among other things, "tomorrow, when you go into court, you're gonna look at a judge and a prosecutor. . . . And they're gonna look at all this stuff, all these allegations that were made against you." (Internal quotation marks omitted.) Id., 325. Similarly, in *State* v. *Culbreath*, 340 Conn. 167, 263 A.3d 350 (2021),[6] after reiterating the two options available to an interrogating officer following an equivocal request for counsel under *Purcell*, we held that, following the suspect's request for counsel; see id., 174 ("[i]s there anybody I can talk to .

___

[6] In *State* v. *Culbreath*, supra, 340 Conn. 191, 200, we held that an officer's failure to stop and clarify an equivocal request for counsel required suppression of any subsequent statements made by the defendant, warranting a reversal in part of the trial court's judgment, even though we issued our decision in *Purcell* after the defendant's trial concluded. Unlike the interrogation at issue in *Culbreath*, at the time of Brownell's interview with the defendant in the present case, *Purcell* had been the law of this state for nearly eighteen months.

State *v.* Johnson

. . [l]ike an attorney or something" (internal quotation marks omitted)); it was impermissible for the officers to indicate that, if the suspect decided to have an attorney present, the attorney probably would not let the suspect talk to the officers. Id., 186, 188. Although, as a practical matter, either of the officers' statements in *Purcell* or *Culbreath* might have been accurate under the circumstances, we held unanimously in both cases that they worked not to clarify whether the suspects wanted to have counsel present but instead as an attempt to convince the suspects that it was not in their best interests to terminate the interview.

Brownell's response to the defendant in the present case might have been innocuous had it been materially correct under the circumstances—if, for example, the defendant was exiting the police station for the transport vehicle, leaving no practical way to obtain an attorney prior to arriving at court. See, e.g., *Thompson* v. *Wainwright*, supra, 601 F.2d 772 (police officer's explanation to suspect of consequences of speaking to counsel may be proper, if correct). Although Brownell's response to the defendant's simple questions—"I can't have a lawyer present, right," and, "[c]an I have a lawyer present, or no"—was perhaps, on its face, not as egregious as the officers' statements in *Purcell* and *Culbreath*, on this record, it conveyed information based on an unsupported assumption that the defendant required appointed counsel who would not be available prior to his arraignment. It is this simple: what Brownell told the defendant about the availability of counsel was not true, or, at best, not necessarily true.

I am not convinced that Brownell's statements did not work to invoke the same inference in the defendant's mind that we have categorized as an attempt at persuasion rather than clarification—that, to obtain whatever benefit the defendant perceived in speaking with the detective, it might be in the defendant's best interest to continue to do so immediately, without the counsel who would be assigned at the courthouse. As in *Purcell*

State *v.* Johnson

and *Culbreath*, Brownell's responses were not limited to clarifying the defendant's desire to have counsel present, as *Purcell* and our state constitution demand, but focused on continuing the interview with the defendant. The majority's confidence that Brownell's response did not undermine the defendant's subsequent waiver of his rights is misplaced, in my view, and inconsistent with the policies that animate not only the required prophylaxis of *Purcell*, but that of *Miranda* itself: to counteract, rather than to manipulate, the inherently coercive nature of custodial interrogations by demonstrating that interrogators are prepared to recognize a suspect's constitutional rights should he choose to exercise them.

This is particularly true in the defendant's circumstance, given his lack of a prior criminal record. Often, we are quick to consider a suspect's previous exposure to the criminal justice system relevant when determining whether the suspect had knowingly and voluntarily waived his *Miranda* rights. See, e.g., *State* v. *Griffin*, 339 Conn. 631, 688, 262 A.3d 44 (2021) (suspect's experience with criminal justice system rendered him less susceptible to police coercion and suggested that he understood nature of *Miranda* rights and consequences of waiving them), cert. denied, U.S. , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022); *State* v. *Madera*, 210 Conn. 22, 45, 554 A.2d 263 (1989) (suspect's prior exposure to criminal justice system was relevant to his knowledge of *Miranda* rights and susceptibility to police coercion); cf. *State* v. *Brandon*, 345 Conn. 702, 743, 749, 287 A.3d 71 (2022) (probationer's experience and familiarity with probation office offset coercive atmosphere of that office, where probationer was interrogated, and weighed against finding of custody), cert. denied, U.S. , 143 S. Ct. 2669, 216 L. Ed. 2d 1242 (2023). Because the defendant in this case had no prior exposure to the criminal justice system, we cannot presume that he was able to distinguish between the practical and the substantive implications of Brownell's response. Rather, it was fair for the defendant to take at face value the explanation from the only representative of the government he had been exposed

354 Conn. 96 FEBRUARY, 2026 143

State *v.* Johnson

to—that, "[i]f [he] wanted a lawyer right now, it's going to happen when [he] go[es] over to court, is what it boils down to"; he had no right to have a lawyer present at the police station. Moreover, to the uninitiated (and perhaps to many of the initiated), being arrested and transported to court, where the defendant will face a judge and be charged with murder, is likely to bear more than logistical or technical significance.

Ultimately, the practicalities of a suspect's circumstances do not relieve interrogators of their duty under our state constitution and our decision in *Purcell* to clarify a suspect's equivocal request for counsel, and to do so in a way that does not operate to confuse, delay or discourage the suspect from exercising that right. In this regard, I find persuasive the reasoning of the Supreme Court of Mississippi in *Downey* v. *State*, 144 So. 3d 146 (Miss. 2014).[7] In that case, an officer responded to an accused's equivocal request for counsel by stating that an attorney could not be brought to jail "right this minute" and asked the accused if she would like to speak without an attorney or wait. (Internal quotation marks omitted.) Id., 152. The accused, who previously had no desire to speak to the officer without counsel, then agreed to talk with the officer. Id. The court determined that the officer had exceeded the bounds of clarifying the accused's request by emphasizing the time and difficulty that would be involved in obtaining counsel and infringed on the accused's right to cease the interrogation, reasoning that the standard for providing counsel does not depend on the expediency with which counsel can be secured for the accused. See id., 153–54.

In the present case, the defendant at least equivocally indicated his desire to have counsel present by posing a yes or no question to Brownell. Rather than attempting to clarify the defendant's request, Brownell emphasized the logistical obstacles that would be involved in

[7] In *Franklin* v. *State*, 170 So. 3d 481, 489–91 (Miss. 2015) (plurality opinion), a plurality of the Mississippi Supreme Court endorsed the United States Supreme Court's decision in *Davis* but did not overrule *Downey* v. *State*, supra, 144 So. 3d 146.

State *v.* Johnson

obtaining counsel, potentially confusing the defendant and discouraging him from further attempting to invoke his rights, which did not depend on the practicalities of his circumstances.

B

Although the majority concedes that Brownell's response to the defendant's straightforward question was "not perfect" or "the best" explanation of the defendant's right to counsel, it dismisses any confusion Brownell created "[b]ecause he clarified the defendant's equivocal request for counsel by both reissuing the *Miranda* advisement and securing a signed wavier before conducting any further questioning . . . ." Part II of the majority opinion. I acknowledge that, under certain circumstances, re-reciting *Miranda* warnings and securing the suspect's signature anew on a waiver of rights form can play a part in clarifying a suspect's equivocal request for counsel, as required by *Purcell*. See, e.g., *Jackson* v. *State*, 299 So. 3d 823, 835 (Miss. App.) (repeating *Miranda* warnings was reasonable attempt to clarify when suspect made two conflicting statements regarding right to counsel), cert. denied, 300 So. 3d 43 (Miss. 2020); see also *State* v. *Honsch*, Docket No. HHB-CR-180292747-T, 2022 WL 3010884, *6 (Conn. Super. July 28, 2022) (reading *Miranda* warnings pertaining to counsel immediately after suspect asked, "is this the thing where I'm supposed to get a lawyer or something because of something," was reasonable attempt to clarify under *Purcell* whether he desired counsel (internal quotation marks omitted)), aff'd, 349 Conn. 783, 322 A.3d 1019 (2024). However, as several courts have held when applying the stop and clarify rule, repeating the *Miranda* rights will often be of no assistance in deciphering a suspect's intent to invoke his request for counsel. See, e.g., *Towne* v. *Dugger*, 899 F.2d 1104, 1110–11 (11th Cir.) (repeating *Miranda* warnings was insufficient when officers did not seek to clarify suspect's equivocal request for counsel and instead made additional accusatory statements) (overruled in part on other grounds sub silentio by *Davis*

354 Conn. 96 FEBRUARY, 2026 145

State *v.* Johnson

v. *United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)), cert. denied, 498 U.S. 991, 111 S. Ct. 536, 112 L. Ed. 2d 546 (1990); *State* v. *Gray*, 2001 WL 1628306, *6–7 (Del. Super. March 13, 2001) (readministering *Miranda* warnings was insufficient to clarify when detective made negative comments designed to persuade suspect to keep talking); *State* v. *Chew*, 150 N.J. 30, 63, 695 A.2d 1301 (1997) ("[l]ater administration of *Miranda* warnings did not serve to clarify the earlier equivocal assertion of right to counsel") (overruled in part on other grounds by *State* v. *Boretsky*, 186 N.J. 271, 894 A.2d 659 (2006)), cert. denied, 528 U.S. 1052, 120 S. Ct. 593, 145 L. Ed. 2d 493 (1999). I believe this is such a case. Fundamental to our rationale in adopting a stop and clarify approach in *Purcell* was the recognition that "the question of whether suspects *understand* their *Miranda* rights is largely distinct from the question of whether they know the unequivocal manner in which they would have to *exercise* those rights to give them effect . . . ." (Emphasis in original.) *State* v. *Purcell*, supra, 331 Conn. 355. I therefore cannot conclude, as the majority does, that, by repeating what has become a "talismanic incantation" of the standard *Miranda* advisement, and securing a signed waiver, Brownell clarified the defendant's equivocal request for counsel, curing the effect of the objective misinformation provided to the defendant both before and after the recitation of the *Miranda* warnings. *California* v. *Prysock*, 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981). In my view, the majority's holding today weakens our holding in *Purcell* significantly, leaving proper police practice in the face of an equivocal request for counsel no more constrained than before that recent and seminal precedent.

Although Brownell might not have made additional accusatory statements as in *Towne* v. *Duggar*, supra, 899 F.2d 1107, in which the officer responded to the suspect's inquiry about a lawyer by listing potentially incriminating evidence the police had concerning the suspect and then repeating the *Miranda* warnings, or, as in *State* v. *Gray*, supra, 2001 WL 1628306, *6–7, in which the

State *v.* Johnson

police repeatedly urged the suspect to be honest and that telling the truth would benefit him before repeating his *Miranda* rights, the information that Brownell provided to the defendant was inaccurate, did not serve to clarify the defendant's request, and similarly undercut the defendant's attempts to exercise his right to counsel. After rereading the defendant his full *Miranda* warnings and securing a second written waiver of those rights, Brownell again emphasized that the defendant could not have an attorney present while talking to Brownell at the police station: "Do you understand those? I know you mentioned having an attorney when we first got here. Okay. *That's something that would happen over at court.*" (Emphasis added.) The reasonable interpretation of this statement is, "no, you cannot have an attorney if you want to talk with me now." To summarize, although it is true that Brownell then highlighted the defendant's right to have counsel present—"[s]o, if you are not comfortable talking to me right now without an attorney, that's your choice. I understand that"—he did so after telling the defendant repeatedly that he could *only* talk to Brownell without an attorney at the police station.

As we noted in *Purcell*, "the issue of whether a police officer can press forward with interrogation in the face of a statement that a suspect reasonably believes to be an invocation of his *Miranda* right to have counsel present is akin to the concern this court expressed in *Stoddard* regarding police interference with access to counsel." *State* v. *Purcell*, supra, 331 Conn. 347 n.18. In my view, by providing misinformation regarding when the defendant could exercise his right to counsel, Brownell, intentionally or not, did just that: interfered with the defendant's exercise of that right.

In *United States* v. *Vargas-Saenz*, 833 F. Supp. 2d 1262 (D. Or. 2011), in which a law enforcement officer responded to a suspect's equivocal request for counsel by stating that an attorney would not be appointed "for a day or two," the court held that the response did not serve to clarify the suspect's request, and that, although the

State *v.* Johnson

officers subsequently reread the *Miranda* warnings, the suspect became confused and, therefore, repeating the *Miranda* warnings was insufficient to clarify because the "damage was done." (Internal quotation marks omitted.) Id., 1265. In the present case, the majority concludes—with confidence, but without factual evidence or legal justification—that "Brownell's additional commentary did not undermine the effect of the defendant's waiver of his right to have an attorney present for the September 24 interview." Part II of the majority opinion. The majority also fails to acknowledge the heavy burden that rests on the government to prove that Brownell's commentary did not undermine that waiver, and that the defendant's subsequent waiver was made "knowingly and intelligently . . . ." *Miranda* v. *Arizona*, supra, 384 U.S. 475; see also id. ("[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel"). How can the state possibly meet this heavy burden when Brownell erroneously told the defendant that he simply could not have counsel present for any further discussion at the police station? The majority declines to say.

Under *Purcell*, in undertaking to clarify whether a suspect has requested counsel, an investigating officer's questions must be limited, properly administered, and narrowly designed only to discern the suspect's intent to exercise his right to have counsel present. See *State* v. *Purcell*, supra, 331 Conn. 360. Officers are not permitted to use this opportunity, directly or by innuendo, to comment, editorialize, or convey extraneous information that may have the effect of delaying, misleading, persuading or coercing the suspect into continuing the interrogation or dissuade him from invoking his right to counsel; the response must serve only to dispel ambiguity and to obtain an explicit and unequivocal assertion by the suspect as to whether he wants a lawyer prior to any further interrogation. *Purcell* demands that the officer

State *v.* Johnson

not engage further with the defendant unless and until that clarification is obtained. Id., 359–62; see also, e.g., *United States* v. *March*, 999 F.2d 456, 461–62 (10th Cir.) ("clarifying questions must be purely ministerial, not adversarial, and cannot be designed to influence the subject not to invoke his rights"), cert. denied, 510 U.S. 983, 114 S. Ct. 483, 126 L. Ed. 2d 434 (1993); *Parker* v. *Singletary*, 974 F.2d 1562, 1572–73 (11th Cir. 1992) (bounds of permissible clarification were exceeded when officers confused suspect in exercise of his rights rather than elucidated suspect's request); *Christopher* v. *Florida*, 824 F.2d 836, 842 (11th Cir. 1987) (clarification of suspect's intent to invoke right to remain silent does not permit questions that, "though clothed in the guise of clarification, are designed to, or operate to, delay, confuse, or burden the suspect in his assertion of his rights" (footnote omitted; internal quotation marks omitted)), cert. denied sub nom. *Dugger* v. *Christopher*, 484 U.S. 1077, 108 S. Ct. 1057, 98 L. Ed. 2d 1019 (1988); *Nash* v. *Estelle*, 597 F.2d 513, 517 (5th Cir.) ("interrogating officer may [not] utilize the guise of clarification as a subterfuge for coercion or intimidation"), cert. denied, 444 U.S. 981, 100 S. Ct. 485, 62 L. Ed. 2d 409 (1979).

With today's decision, a majority of this court now allows law enforcement to press forward with an interrogation of a suspect who, reasonably understood, sought to invoke his *Miranda* right to have counsel present for *any* custodial interrogation, so long as the officer establishes that the suspect has been read and purports to understand his *rights as a whole.* The majority justifies simply repeating the *Miranda* warnings as "reasonable and sufficient" to clarify an equivocal request for counsel under *Purcell* because the officer has sought to ensure that the suspect understands "*all of his rights*, including the right to counsel, before any interrogation commence[s]." (Emphasis added.) Part II of the majority opinion. The additional layer of prophylaxis that our state constitution requires, which we so recently and unanimously declared in *Purcell* demands greater precision, however, is that the officer clarify a

State *v.* Johnson

suspect's *desire to exercise* a particular one of those rights (his right to have counsel present) when he attempts to invoke it, if only equivocally. *Purcell*'s instruction to law enforcement is clear: officers must limit their statements following such an equivocal request to those designed to elucidate the defendant's *desire for counsel*, not statements that might serve to clarify the suspect's rights in general. *State* v. *Purcell*, supra, 331 Conn. 362. In my view, approving the readvisement of rights the defendant had heard before, but did not understand (as evidenced by his need to ask whether he could have a lawyer present at the police station), serves to embolden officers to engage in the very subtle and refined forms of coercion that threaten *Miranda*, against which our stop and clarify approach was intended to protect. See id., 359–60. In resolving to adopt the stop and clarify rule to protect individuals' state constitutional rights, we sought to advance the purpose of the *Miranda* warnings, which is to demonstrate to suspects that their interrogators are prepared to honor their right to counsel if they choose to exercise it. See id., 360. The majority claims that Brownell accomplished this goal, going so far as to assert that, despite the flaws in his initial response, "by readministering the *Miranda* warnings in their totality," he conveyed "precisely" what he would have accomplished if he had furnished the "best response"—" 'yes, you may have counsel present during questioning.' " Part II of the majority opinion. I disagree that Brownell conveyed this critical, constitutional message. The effect of repeated warnings here, after the defendant had asked a yes or no question and was provided with an ambiguous and inaccurate answer, was anything but "precise." As a result, the answer to the defendant's question about his right to have counsel present was buried in the prophylactic *Miranda* package, which the defendant had already demonstrated that he did not fully understand by virtue of his questions to Brownell. The unhelpful repetition was then followed by repeating the inaccurate statement that, if the defendant chose to exercise his right to have counsel present, "[t]hat's something that would happen

State *v.* Johnson

over at court." This inaccuracy diminished any clarification that repeated *Miranda* warnings could possibly provide in these circumstances. In fact, it is lost on me how today's decision does not codify tactics of deflection, confusion, and delay as a best (or good enough) practice for officers attempting to keep suspects talking, as long as the officer repeats the standard *Miranda* warnings.

In my view, Brownell's repetition of the *Miranda* warnings was ineffective and insufficient to clarify the defendant's desire for counsel because the defendant was led to believe that he could not have a lawyer until he was in court. Allowing the repetition of *Miranda* warnings to suffice under these circumstances erodes the protection of *Miranda* and *Purcell* for the accused in Connecticut.

Because I conclude that the state has failed to demonstrate that the trial court's error was harmless beyond a reasonable doubt, I do not reach parts I or III of the majority opinion and would reverse the trial court's judgment and remand the case for a new trial.

Accordingly, I respectfully dissent as to part II of the majority opinion.